# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re C.J.*, 2011 IL App (4th) 110476

---

| | |
|---|---|
| Appellate Court Caption | In re: C.J., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. VICKY IZAGUIRRE, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0476 |
| Filed | November 2, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's adjudication that respondent's child was an abused minor and the appointment of the Department of Children and Family Services as his guardian were affirmed where respondent's admission at the adjudicatory hearing that the child was an abused minor was knowing, there was competent evidence supporting respondent's admission, including evidence that the child had suffered broken ribs while in respondent's care that could not have been accidental, and respondent's right to due process was not violated. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No.10-JA-145; the Hon. Kevin P. Fitzgerald, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Adele M. Saaf, of Bloomington, for appellant.

William A. Yoder, State's Attorney, of Bloomington (Patrick Delfino, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices Appleton and Pope concurred in the judgment and opinion.

## OPINION

¶ 1    In March 2011, the State filed a first supplemental petition for adjudication of wardship, alleging that C.J. (born July 4, 2010), the minor child of respondent, Vicky Izaguirre, was an abused minor pursuant to section 2-3(2)(i) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(2)(i) (West 2010)). Following a March 2011 adjudicatory hearing, the trial court adjudicated C.J. an abused minor based, in part, on respondent's admission at that hearing. Following a May 2011 dispositional hearing, the court adjudicated C.J. a ward of the court and continued the appointment of the Department of Children and Family Services (DCFS) as his guardian.

¶ 2    Respondent appeals, arguing that (1) her admission that C.J. was an abused minor was not knowing, (2) the trial court erred by considering incompetent evidence to determine a factual basis supported her admission, and (3) the court committed plain error by implementing a procedure that fundamentally affected the fairness of the adjudicatory hearing in violation of her right to due process of law. We disagree and affirm.

¶ 3                    I. BACKGROUND

¶ 4    On October 6, 2010, the State filed a petition for adjudication of wardship, alleging, in pertinent part, that C.J. was an abused minor in that respondent and C.J.'s biological father, Cordarius Jolly, inflicted, caused to be inflicted, or allowed to be inflicted upon C.J. physical injury by nonaccidental means that resulted in C.J. sustaining injuries, which included five fractured ribs. (Jolly is not a party to this appeal.)

¶ 5            A. The Evidence Presented at the Shelter-Care Hearing
                    and the Trial Court's Judgment

¶ 6    At a shelter-care hearing conducted the next day, the trial court considered a shelter-care report prepared by DCFS, which showed the following.

¶ 7    On September 30, 2010, respondent and Jolly brought three-month-old C.J. to the Saint Joseph's Medical Center, where an initial medical examination revealed that C.J. had (1) two fractured ribs; (2) a centimeter long, linear bruise in his right armpit; (3) a scab with abrasions on his lower back; and (4) several scratches on his abdomen. Saint Joseph's later called DCFS because respondent and Jolly could not explain how C.J. sustained the injuries and further testing confirmed that C.J. did not have a "brittle-bone" condition.

¶ 8    While at Saint Joseph's, respondent explained to the DCFS representative that on September 24, 2010, she and C.J. moved into Jolly's home. Later that day, respondent left C.J. with Jolly's mother for the weekend. At that time, respondent described C.J.'s condition as "fine." The next day, Jolly's sister called respondent and suggested taking C.J. to BroMenn Healthcare because C.J. was crying and his stomach felt hard. BroMenn treated C.J. for colic and abdominal gas.

¶ 9    On September 27, 2010, respondent returned to BroMenn because she noticed that C.J.'s "side was hurt and would pop when [she] touched it." BroMenn took X-rays of C.J.'s abdomen and organs but did not find any abnormalities. Three days later, respondent and Jolly brought C.J. to Saint Joseph's Medical Center because (1) C.J. continued to cry and (2) they were not confident that BroMenn could accurately diagnose and treat C.J.

¶ 10    Jolly's statements contradicted respondent's account in that Jolly initially informed the DCFS representative that C.J. (1) was crying when they dropped C.J. off at his mother's home and (2) stayed at his mother's home for two hours instead of staying overnight as respondent claimed. Jolly later changed his story to coincide with respondent's account. In addition, Jolly stated that on September 27, 2010, he first felt C.J.'s rib pop, but later changed the date to September 29, 2010.

¶ 11    Saint Joseph's admitted C.J. for overnight observation, but he was later transferred to the Children's Hospital of Illinois in Peoria. On October 2, 2010, the hospital conducted a magnetic resonance imaging (MRI) and skeletal survey, which revealed five rib fractures that were less than one week old. Three days later, the hospital released C.J. into DCFS's protective custody.

¶ 12    After considering the shelter-care report and respondent's stipulation at the shelter-care hearing that (1) probable cause existed to believe that C.J. had been abused and (2) an immediate and urgent necessity required C.J.'s placement in shelter care, the trial court entered an order granting DCFS temporary custody of C.J.

¶ 13    B. The Evidence Presented at the Adjudicatory Hearing
and the Trial Court's Judgment

¶ 14    Following several continuances prompted by discovery issues and twice changing counsel, in March 2011, the State filed a first supplemental petition for adjudication of wardship. In that petition, the State alleged, in pertinent part, that C.J. was an abused minor in that respondent, Jolly, or an immediate family member inflicted, caused to be inflicted, or allowed to be inflicted upon C.J. physical injury by nonaccidental means that resulted in C.J. sustaining several injuries, which included five fractured ribs. (The State's first supplemental petition (1) eliminated an allegation of neglect against Jolly and (2)

-3-

consolidated the separate abuse allegations against respondent and Jolly in its initial petition for adjudication of wardship.)

¶ 15    At the March 9, 2011, adjudicatory hearing, the trial court addressed the parties, as follows:

"The State has filed *** a First Supplemental Petition for Adjudication of Wardship. The court was advised prior to going on the record that [respondent and Jolly] were going to make an admission to that First Supplemental Petition and that, further, [respondent and Jolly] are going to[,] if the Court found a factual basis, free and voluntary admission, then the Court was going to receive documentation from [the State] for the Court to try to determine what acts or omissions of the parents or other legal custodians form the basis of the Court's findings. And then the matter was going to be recessed for the Court to review that material which included *** police reports, interviews of the parents, medical records, and then resume tomorrow morning for argument and the Court's determination, to the extent possible, whether or not the Court can determine what acts or omissions of the parents form the basis of the finding of abuse."

¶ 16    After the trial court confirmed that respondent (1) agreed with its procedural summation, (2) understood the allegation of abuse contained in the State's first supplemental petition for adjudication of wardship, and (3) was not promised anything to obtain her admission to the State's abuse allegation, the court asked the State to provide a factual basis. The State informed the court that it had previously discussed the following records–that it was introducing as its factual basis–with respondent's attorney and the guardian *ad litem*: (1) the curriculum vitae of Dr. Channing Smith Petrak, who performed C.J.'s medical examination at the Children's Hospital of Illinois; (2) Dr. Petrak's written report of C.J.'s examination; (3) the pertinent medical records from BroMenn and Saint Joseph's; (4) an October 1, 2010, police incident report; and (5) a digital recording of respondent's police interview. Respondent then stipulated to the State's factual basis.

¶ 17    Because the trial court had yet to review the exhibits proffered by the State, the court relied on the shelter-care report–which the court had reviewed in preparation for the adjudicatory hearing–to find that a factual basis existed. Based on that finding and respondent's knowing and voluntary admission, the court adjudicated C.J. an abused minor. Thereafter, the court continued the matter to consider the State's exhibits to determine–to the extent that the court could–respondent's acts or omissions that formed the basis of its abuse finding.

¶ 18    At the continuation of the adjudicatory hearing conducted the following day, the trial court noted that the MRI and skeletal survey conducted on October 2, 2010, revealed the existence of five rib fractures. Relying on Dr. Petrak's medical report, in which she opined that C.J.'s fractures were less than one week old, the court surmised that C.J.'s injuries were likely inflicted after September 25, 2010, when C.J. was in the exclusive care of respondent, Jolly, or both. In this regard, the court stated as follows:

"[W]hether or not the Court can narrow it down further and try to determine which parent inflicted and, as [the court] indicated, [the court thinks C.J.'s injuries] probably occurred [when] he was having a crying spell because of his colickiness. *** [Respondent and

-4-

Jolly] are relatively young ***, *** inexperienced parents, and we had several people note, including [Jolly's] mom, that they both became frustrated often. And [Jolly's] friend *** indicated that *** Jolly became frustrated ***. You've got relatively young parents–[the court thinks] they are both 19 [years old] at the time this occurred–not experienced parents. And if you have a colicky baby, [the court thinks] it is certainly within the realm of possibility that an inexperienced parent would be experiencing frustration and pick up the child and squeeze [him] too hard, which is what [the court thinks] likely happened in the absence of any other plausible explanation ***."

Thereafter, the court found that C.J.'s injuries were inflicted after September 25, 2010, when C.J. was under the care of either respondent or Jolly. The court then entered a written order, adjudicating C.J. an abused minor. Following a May 2011 dispositional hearing, the court adjudicated C.J. a ward of the court and continued the appointment of DCFS as his guardian.

¶ 19    This appeal followed.

¶ 20                                   II. ANALYSIS

¶ 21    Respondent argues that (1) her admission that C.J. was an abused minor was not knowing, (2) the trial court erred by considering incompetent evidence to determine a factual basis supported her admission, and (3) the court committed plain error by implementing a procedure that fundamentally affected the fairness of the adjudicatory hearing in violation of her right to due process of law.

¶ 22    The State responds that because respondent failed to object at the adjudicatory hearing to the issues she now complains about or to file an appropriate posttrial motion to afford the trial court the opportunity to address her claims, she has forfeited those arguments for review. We agree with the State that by failing to properly preserve the issues she now raises, respondent has forfeited those issues on appeal. See *In re William H.*, 407 Ill. App. 3d 858, 869-70, 945 N.E.2d 81, 91 (2011) (to preserve an alleged error for appellate review, a party must object at trial and file a written posttrial motion addressing it even in cases under the Act). We note, however, that the forfeiture rule is a limitation on the parties and not on this court's jurisdiction. *Maniez v. Citibank, F.S.B.*, 404 Ill. App. 3d 941, 948, 937 N.E.2d 237, 244 (2010). Here, despite respondent's failure to properly preserve the aforementioned issues, we consider them sufficiently significant to warrant our review. Thus, we address respondent's arguments in turn.

¶ 23                   A. Respondent's Claims That Her Admission at the
                             Adjudicatory Hearing Was Not Knowing

¶ 24    Respondent argues that her admission that C.J. was an abused minor was not knowing. Specifically, respondent contends that because the State did not present a factual basis before she made her admission, she could not have knowingly admitted the State's allegation. Respondent also contends that because the State's allegations of abuse deviated from the statutory language by broadening the class of individuals who could have perpetrated the abuse, she could not have known whether her conduct fell within the parameters of the

statutory language or within the broader, nonstatutory allegations.

¶ 25                    1. *Respondent's Contention Regarding the Timing*
                          *of the State's Factual Basis*

¶ 26        Relying on *In re M.H.*, 196 Ill. 2d 356, 751 N.E.2d 1134 (2001), respondent contends that because the State did not present a factual basis to the trial court before she made her admission that C.J. was an abused minor, she could not have knowingly admitted the State's allegation. The State responds that (1) because *M.H.* is distinguishable from the facts of this case, it does not offer respondent any support and (2) the record shows the court found a factual basis existed prior to accepting respondent's admission. We agree with the State.

¶ 27        We review *de novo* the question of law regarding whether a trial court is required to elicit a factual basis prior to accepting a respondent's admission. *M.H.*, 196 Ill. 2d at 361, 751 N.E.2d at 1139.

¶ 28        In *M.H.*, 196 Ill. 2d at 359-60, 751 N.E.2d at 1137, the trial court conducted a fitness hearing, at which the respondent admitted the allegations contained within the State's supplemental petition for termination of her parental rights. The court accepted the respondent's admission that she was unfit without requiring the State to proffer any factual basis for that admission. *M.H.*, 196 Ill. 2d at 359-60, 751 N.E.2d at 1137-38. Following a later best-interest hearing, the court terminated respondent's parental rights. *M.H.*, 196 Ill. 2d at 360, 751 N.E.2d at 1138. On appeal, the appellate court reversed, concluding that the court was required to determine that a factual basis existed for the respondent's admission. *Id.*

¶ 29        In affirming the appellate court's reversal, the supreme court–recognizing a parent's fundamental interest in the control, custody, and care of her children and the State's burden to provide clear and convincing evidence to support an allegation that parental rights should be terminated because of parental unfitness–held that due process requires a court to ensure the existence of a factual basis prior to accepting a parent's unfitness admission. *M.H.*, 196 Ill. 2d at 365-68, 751 N.E.2d at 1141-43. The supreme court noted that in so doing, a court ensures that the respondent's admission is knowing and voluntary and not instead based upon an ill-advised admission of unfitness. *M.H.*, 196 Ill. 2d at 366-67, 751 N.E.2d at 1142.

¶ 30        We reject respondent's contention that *M.H.* stands for the proposition that the State must provide a factual basis *prior* to a respondent's admission that a child is abused, neglected, or dependent at an adjudicatory hearing. Instead–as we have noted–*M.H.* stands for the proposition that "due process requires a [trial] court to determine whether a factual basis exists for an admission of parental unfitness *before it accepts the admission*." (Emphasis added.) *M.H.*, 196 Ill. 2d at 368, 751 N.E.2d at 1142-43.

¶ 31        In *In re A.A.*, 324 Ill. App. 3d 227, 239-40, 754 N.E.2d 826, 836 (2001), the Fifth District Appellate Court distinguished the holding in *M.H.*, which was made in the context of a petition to terminate parental rights, from an admission made pursuant to a petition for adjudication of wardship–as in the instant case–as follows:

        "The risk of an erroneous temporary deprivation of this right, however, is not quite

the same as the risk involved in a permanent termination proceeding like the one in *In re M.H.* After the initial, adjudicatory stage of the proceedings, the parents have numerous opportunities over a lengthy period of time to regain the custody of their children. In contrast, after the order terminating parental rights is filed, the parents' only avenue of redress is with the courts of review. Because the risk of an erroneous deprivation involves a much greater loss with much less ability to correct any errors, the proof required at the two stages of the proceedings is also different. At the initial, adjudicatory stage, the State must prove the right to remove the children from the parents' custody by a preponderance of the evidence. At the termination stage, the State must prove the parents to be unfit by clear and convincing evidence. The difference in the level of proof necessary at each stage is relevant to the issue before us \*\*\*, because *if an adjudication is proper with only a preponderance of the evidence, then a lower level of proof, by way of a parental admission together with facts of record demonstrating the factual basis for the initial removal, is sufficient to protect the parents' due process rights at that stage of the proceedings*. Since the risk of an erroneous deprivation is lower at the adjudicatory stage than at the termination stage, there is no due process right to any additional procedural safeguards over and above those already in place herein." (Emphasis added.)

¶ 32 Here, the record shows that following respondent's acknowledgment that she (1) understood the allegation of abuse contained in the State's first supplemental petition for adjudication of wardship and (2) was not promised anything to obtain her admission to the State's abuse allegation, the State then proffered medical records, medical and police reports, and a digital recording of respondent's police interview as its factual basis. In response to the trial court's inquiry, respondent stipulated to the sufficiency of that factual basis. The court, however, noting that it had yet to review any of the documents offered by the State, chose to rely instead on the shelter-care report as the factual basis *before* it accepted respondent's admission that C.J. was an abused minor, which was in accordance with the supreme court's guidance in *M.H.* and the Fifth District's further clarification in *A.A.*

¶ 33 Therefore, we reject respondent's contention regarding the timing of the factual basis at her adjudicatory hearing.

¶ 34 *2. Respondent's Contention Regarding the Wording of the State's First Supplemental Petition for Adjudication of Wardship*

¶ 35 Respondent also contends that because the State's allegations of abuse deviated from the statutory language by broadening the class of individuals who could have perpetrated the abuse, she could not have known whether her conduct fell within the parameters of the statutory language or within the broader, nonstatutory allegations. We disagree.

¶ 36 a. The Statutory Definition of an Abused Minor

¶ 37 Section 2-3(2)(i) of the Act provides, in pertinent part, the following:

"(2) Those who are abused include any minor under 18 years of age whose parent or

immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

   (i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(i) (West 2010).

¶ 38    b. The State's Allegation in Its First Supplemental Petition for Wardship

¶ 39    On March 9, 2011, the State filed a first supplemental petition for adjudication of wardship. In that petition, the State alleged the following:

   "[C.J.] is abused in that a parent or immediate family member, or any person responsible for [C.J.'s] welfare, or any person who is in the same family or household as [C.J.], inflicted, or allowed to be inflicted, physical injury to [C.J.] by other than accidental means, which would be likely to cause disfigurement, impairment of emotional health, or loss of impairment of any bodily function, in that [two-]month old [C.J.] sustained multiple rib fractures, a bruise in the right armpit, a scab with abrasions on the lower back and several scratches on the abdomen. The injuries remain unexplained, however non-abusive means have been ruled out by a medical expert. *The injuries occurred while [C.J.] was in the care of a parent or parents or in the care of one to whom they entrusted [C.J.'s] care.*" (Emphasis added.)

¶ 40    c. Respondent's Assertion Regarding the Broadness of the
State's Petition for Adjudication of Wardship

¶ 41    In support of her contention, respondent focuses on the final sentence of the State's allegation, claiming that because it is "significantly broader" than the statutory language of section 2-3(2)(i) of the Act, she could not have known whether her conduct fell within the parameters of the statutory language or within the broader, nonstatutory allegations. In other words, respondent's assertions focus on *her* actions. As this court has consistently stated, however, " 'the purpose of juvenile court proceedings is to determine the *status* of the child on whose behalf the proceedings are brought, *not* to determine any particular person's criminal or civil liability.' " (Emphases in original.) *In re J.W.*, 386 Ill. App. 3d 847, 854, 898 N.E.2d 803, 809 (2008) (quoting *In re R.B.*, 336 Ill. App. 3d 606, 614, 784 N.E.2d 400, 407 (2003)). In *R.B.*, 336 Ill. App. 3d at 615-16, 784 N.E.2d at 407-08, this court posed the following hypothetical scenario–which interestingly, is substantially similar to the facts before us–to demonstrate why causation is irrelevant at the adjudicatory hearing:

   "[C]onsider the case in which the State alleges that a 1 1/2-year-old child is abused because she suffered physical injury, by other than accidental means, which caused impairment of her physical health. The State's petition alleges the child suffered multiple and deep bruises, as well as welts, over several months, indicative of excessive corporal punishment. Assume further that because the State does not know who inflicted this

punishment, its abuse petition merely alleges that it was inflicted 'by a parent or immediate family member or any other person who is in the same family or household as the child.' [Citation.] Further, assume at the adjudicatory hearing that the State is able to prove, through medical testimony, the allegation that this 1 1/2-year-old child suffered multiple and deep bruises and welts over several months but is not able to prove who caused the child's injuries. Each parent and the other members of the household testify that they were not responsible for the child's injuries. *** Yet, on these facts, the State would have proved to a moral certainty that this child was an abused minor under section 2-3(2)(i) of the Act because (1) the child suffered the injuries as alleged and (2) *someone* who is a parent, immediate family member, or other member of the child's household is responsible for these injuries.

Surely, the legislature that drafted section 2-3 of the Act–as well as the public–would be outraged and view as bizarre a trial court's ruling at the conclusion of the adjudicatory hearing in this hypothetical case that the child involved was not an abused minor because the State had not proved who was responsible for the abuse. The fact that the State cannot prove causation makes the child no less abused and no less needful of court intervention to both protect her and assure that the abuse stop." (Emphasis in original.)

See *In re Arthur H.*, 212 Ill. 2d 441, 465-66, 819 N.E.2d 734, 748 (2004) (citing *R.B.* approvingly).

¶ 42 Notwithstanding this distinction, section 2-21(1) of the Act mandates that the trial court also conduct the following analysis following a finding of abuse, neglect, or dependency:

"After hearing the evidence the court shall determine whether or not the minor is abused, neglected, or dependent. ***

If the court finds that the minor is abused, neglected, or dependent, the court *shall* then determine and put in writing the factual basis supporting that determination, and specify, *to the extent possible*, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings." (Emphases added.) 705 ILCS 405/2-21(1) (West 2010).

¶ 43 As the aforementioned statutes clearly mandate, the court must undertake the following separate, but interrelated, analyses: (1) determine whether the minor is abused, neglected, or dependent as alleged by the State and (2) determine–to the extent that it can–who was responsible for the abuse, neglect, or dependency. With regard to this second analysis, the legislature directed the court to attempt to specify the parents' acts or omissions that form the basis of the court's findings so as later to inform the court regarding its options when it conducts the dispositional hearing. *J.W.*, 386 Ill. App. 3d at 855, 898 N.E.2d at 810. See 705 ILCS 405/2-23(1)(a) (West 2010) (custody cannot be restored to any person whose acts or omissions formed the basis for the court's finding at an adjudicatory hearing unless that person is found fit at a later hearing).

¶ 44 In this case, the procedure–which was agreed to by the parties–was consistent with the aforementioned statutory scheme. After being informed that respondent intended to admit the abuse allegation in the State's first supplemental petition for adjudication of wardship, the trial court informed respondent that it would first determine whether (1) her admission

was knowing and voluntary and (2) a factual basis existed for her admission. If so, the court informed the parties that it would then continue the matter so it could consider the State's evidence, which included police reports, interviews, and medical records, to determine, to the extent possible, whether respondent's acts or omissions contributed to C.J.'s abuse.

¶ 45     Here, respondent's admission concerned the primary analysis–that is, was C.J. abused as alleged by the State–which we have previously stated does not concern respondent's actions or omissions but instead is focused on C.J.'s status. The portion of the State's first supplemental petition that respondent complains about was not part of the respondent's admission but, instead, was consistent with the trial court's second analysis under section 2-21(1) of the Act. Therefore, we reject respondent's contention regarding the wording of the State's allegation of abuse.

¶ 46     In so concluding, we suggest that at the commencement of adjudicatory hearings, trial courts thoroughly explain to the parties the statutorily mandated procedure. Such an explanation should include clearly articulating the purpose and focus of the primary analysis, which is concerned only with the status of the minor–that is, whether the minor was abused, neglected, or dependent as alleged by the State. The court should further explain that if it makes such a finding, the court will then engage in an independent secondary analysis, which is intended to inform the court when–and if–the proceedings reach the dispositional stage.

¶ 47                    B. Respondent's Claims Regarding the State's Factual
                                 Basis at the Adjudicatory Hearing

¶ 48     Respondent next argues that the trial court erred by considering incompetent evidence to determine a factual basis existed for her admission. Specifically, respondent contends that the court considered inadmissible hearsay statements contained within police interviews with various witnesses. Essentially, respondent claims that the factual basis the State presented to support her admission that C.J. was abused was insufficient. We disagree.

¶ 49     When a respondent challenges the sufficiency of the factual basis, the standard of review is whether the trial court abused its discretion by determining that a factual basis existed for the admission. *In re C.K.G.*, 292 Ill. App. 3d 370, 376-77, 685 N.E.2d 1032, 1036 (1997).

¶ 50     Prior to reaching the merits of respondent's argument, we first outline the factual basis requirements in criminal proceedings to place respondent's argument in proper context.

¶ 51     Illinois Supreme Court Rule 402(c) (eff. July 1, 1997), entitled "Determining Factual Basis for Plea" states the following: "The court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea." In *People v. Barker*, 83 Ill. 2d 319, 327-28, 415 N.E.2d 404, 408 (1980), the supreme court provided the following guidance regarding the necessary threshold requirement to satisfy the factual-basis requirements mandated by Rule 402(c):

> "All that is required to appear on the record is a basis from which the judge could reasonably reach the conclusion that the defendant actually committed the acts with the intent (if any) required to constitute the offense to which the defendant is pleading guilty."

¶ 52    In *People v. Williams*, 299 Ill. App. 3d 791, 794, 701 N.E.2d 1186, 1188 (1998), this court reaffirmed the following procedure we espoused in *C.K.G.*, 292 Ill. App. 3d at 378, 685 N.E.2d at 1037, concerning compliance with Rule 402(c):

> "[A]ll the trial court need do to comply with the factual basis requirement of Rule 402(c) is to ask the prosecutor to *briefly* describe the evidence the State would be prepared to present if the case went to trial. After hearing that recitation, the court should then turn to *defense counsel*–not the defendant personally–and ask the following: 'Ms. Defense Counsel, do you agree that the prosecutor has witnesses who if called would testify substantially as indicated?' Assuming that defense counsel answers 'yes,' the court has fully complied with Rule 402(c)." (Emphases in original.)

¶ 53    In *People v. White*, 2011 IL 109616, ¶ 17, 953 N.E.2d 398, the supreme court provided the following additional guidance concerning the factual basis necessary to support a guilty plea:

> "The factual basis for a guilty plea generally will consist of an express admission by the defendant that he committed the acts alleged in the indictment or a recital to the court of the evidence that supports the allegations in the indictment. [Citation.] The plea obviates the prosecution's burden of proof. It supplies both evidence and verdict, ending controversy." (Internal quotation marks omitted.)

¶ 54    The aforementioned summary of the factual-basis requirements in criminal proceedings is provided to demonstrate that in the case of an adjudicatory hearing conducted because the State has alleged that a child is abused, neglected, or dependent, the primary issue concerns the status of the child. Thus, a factual-basis requirement that supports an admission that the child is abused, neglected, or dependent can be no more burdensome for the State than that required in a criminal context, where a defendant's personal liberty may be at risk.

¶ 55    In this case, we note that despite respondent's contention that the trial court improperly considered hearsay evidence, the State could have simply provided–without more–the following statement to the court to satisfy the factual-basis requirement for respondent's admission:

> "Your Honor, if this case proceeded to an adjudicatory hearing, the evidence would show that sometime after October 25, 2010, C.J. suffered numerous physical injuries, including five fractured ribs, while in respondent's care that could not have been inflicted by accidental means, and respondent was unable to explain the origin of those injuries."

¶ 56    Indeed, given the particular circumstances of this case, the court did not need to rely on the State's factual basis. Specifically, the court could *sua sponte* have noted that it had already heard evidence at the shelter-care hearing that constituted a factual basis for respondent's admission. The court here could have done so just as a court may do when a defendant is pleading guilty to a felony offense and the court takes note of evidence it heard at a preliminary hearing or at a hearing on a motion to suppress that establishes, completely or partially, a factual basis for the guilty plea. See *People v. Bassette*, 391 Ill. App. 3d 453, 457, 908 N.E.2d 1062, 1065 (2009) (determining whether a factual basis exists to support a guilty plea is satisfied if evidence exists anywhere in the record from which the trial court could reasonably conclude that the defendant committed the crime with the requisite intent,

if any).

¶ 57    Here, the State provided substantially more than the minimum amount of evidence required to support respondent's admission that C.J. was an abused minor. In addition, the trial court appropriately considered the shelter-care report to find a factual basis existed for respondent's admission. Accordingly, we conclude that the evidence before the court properly established a factual basis for respondent's admission.

¶ 58                C. The Procedure Implemented at the Adjudicatory Hearing

¶ 59    Respondent next argues that the trial court committed plain error by implementing a procedure that fundamentally affected the fairness of the adjudicatory hearing in violation of her right to due process of law. However, because we have already concluded that the procedure implemented by the court was consistent with the statutory scheme established by the legislature, we reject respondent's argument without further analysis.

¶ 60                                III. CONCLUSION

¶ 61    For the reasons stated, we affirm the trial court's judgment.

¶ 62    Affirmed.