NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220373-U

NO. 4-22-0373

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* P.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
|     Petitioner-Appellee, | ) | No. 19JA146 |
|     v. | ) | |
| Kelli T., | ) | Honorable |
| | ) | Francis M. Martinez, |
|     Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the trial court's judgment terminating respondent's
parental rights because the trial court's failure to recite a factual basis for
respondent's stipulation to her parental unfitness did not violate respondent's due
process rights.

¶ 2        Respondent, Kelli T., is the mother of P.W. (born November 2011). In February

2022, the trial court accepted respondent's stipulation that she was an unfit parent under the

Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)), and in April 2022, it found termination of

respondent's parental rights would be in the minor child's best interest. Respondent appeals,

arguing that the trial court violated her due process rights when it (1) accepted her stipulation to

the grounds for parental unfitness alleged in the State's petition to terminate her parental rights

but (2) failed to recite a factual basis for the allegations. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Procedural History

¶ 5          In May 2019, the State filed an amended petition for adjudication of wardship, alleging P.W. was neglected due to his being a minor whose environment was injurious to his welfare in that his mother, among other things, (1) had a substance abuse problem that prevented her from properly parenting and (2) had a history of domestic violence to which P.W. was exposed. See 705 ILCS 405/2-3(1)(b) (West 2018). On the same day the petition was filed, the trial court conducted a shelter care hearing at which respondent stipulated to probable cause and the factual basis therefor, which was set out, in detail, in a document titled "DCFS Statement of Facts" filed by the State. (We note the statement of facts explains respondent's history of substance abuse, domestic violence, police encounters, and lack of supervision of her children.) The court placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6          In July 2019, the trial court conducted an adjudicatory hearing, at which respondent stipulated that P.W. was a neglected minor when in her custody because P.W. was exposed to domestic violence. Respondent further stipulated that the prior "DCFS Statement of Facts" provided the factual basis for the stipulation. The court accepted the stipulation and adjudicated P.W. a neglected minor.

¶ 7          In September 2019, the trial court conducted a dispositional hearing at which respondent entered an agreement with the State (1) waiving her right to a dispositional hearing and (2) placing guardianship and custody of P.W. with the guardianship administrator of DCFS. The court entered a written order making P.W. a ward of the court based upon its finding that respondent was unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor. The court also concluded it would be

contrary to P.W.'s health, safety, and best interest to be in respondent's custody.

¶ 8                                   B. Subsequent Hearings

¶ 9        We note that in most termination cases, the reviewing court does not examine or

consider permanency review hearings because the evidentiary standards and burdens of proof are

significantly different than those in termination proceedings. See *In re M.D.*, 2022 IL App (4th)

210288, ¶¶ 56-77, 193 N.E.3d 933 (discussing those evidentiary standards and burdens of proof).

However, as we explain in greater detail later (*infra* ¶ 39), because the issue in this case is

whether the trial court had an adequate factual basis to accept respondent's stipulation during the

unfitness portion of the termination proceedings, we are able to consider anything in the record

that was before the trial court to evaluate the adequacy of the factual basis. See *In re Dal. D.*,

2017 IL App (4th) 160893, ¶ 37, 74 N.E.3d 1185 ("[A] court may *sua sponte* look anywhere in

its prior proceedings to determine if a factual basis can be shown."). Accordingly, we set forth

the relevant information in the record that was considered by the trial court during the

permanency review hearings.

¶ 10       Following the dispositional hearing, the trial court over a two-year period

conducted several status and permanency review hearings. At those hearings, the court stated it

was considering the reports filed with the court from caseworkers and the arguments and

representations of the parties. At later hearings, the court heard testimony directly from the

current caseworker. The information contained in those reports and presented at those hearings

showed the following.

¶ 11       For the first year, respondent made reasonable efforts and progress complying

with the service plan and addressing the conditions that caused P.W. to come into care. In

particular, respondent was engaged in substance abuse treatment, parenting classes, and domestic

violence services. In the fall of 2020, respondent relapsed in her substance abuse treatment, specifically pertaining to alcohol, including twice appearing for visitations intoxicated to the point that the caseworker ended the visit. In December 2020, respondent missed (1) several of her substance abuse appointments, (2) a majority of her required drug tests, and (3) sessions for her domestic violence counseling.

¶ 12 During the second half of 2021, respondent had further relapses and struggled to continue to engage in services including (1) domestic violence, (2) parenting classes, (3) individual counseling, and (4) substance abuse. (We note that due to an administrative error by DCFS, respondent lost access to these services for four or five months before June 2021. We also note that respondent neither (1) informed DCFS that she was no longer able to engage in those services nor (2) spoke directly with providers to find out how to re-engage in services.) Respondent also began to miss visits with P.W., which were limited to once per month for his mental and emotional wellbeing, and she frequently missed scheduled drug tests.

¶ 13 At the final permanency review hearing, in December 2021, the caseworker testified in detail about her agency's extensive efforts to make referrals for respondent and to encourage her to engage in services. The caseworker further testified about each of respondent's services and her lack of progress in those services. Respondent was eventually unsuccessfully discharged from every service she had re-engaged in except parenting classes, which allowed respondent to remain enrolled despite having missed so many sessions that she was eligible for discharge.

¶ 14 At the review hearings in January 2021 and December 2021, the trial court made findings on the record that it believed respondent had failed to make reasonable efforts or progress and had a slim chance, if any, at reunification with P.W. At the December 2021

permanency review hearing, the court noted it had read the reports and explained that those reports showed that respondent's "issues are just too numerous and they're very well detailed in the report." As a result, the court found that respondent had failed to make reasonable efforts or progress during the review period. The court concluded that "given the age of the case, determining the goal, certainly with [respondent father] I don't see any prognosis of reunification. And, frankly, the prognosis for [respondent] is poor given her track record of irresponsibility and attending to her services, which are not that difficult." The court changed the goal to substitute care pending termination.

¶ 15        We note that the report of proceedings demonstrates that the trial court was intimately familiar with the case and had a thorough understanding of respondent's circumstances, services, efforts, progress or lack thereof, and the effect the proceedings were having on P.W. We further note that the trial court's familiarity was due, in part, to its handling of the neglect and termination proceedings against P.W.'s three siblings, which had been essentially consolidated with P.W.'s case until the State filed for termination of respondent's parental rights as to the siblings.

¶ 16                                C. The Termination Proceedings

¶ 17        In January 2022, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare, (2) protect the minor from conditions within the environment injurious to the child's welfare, (3) make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within the nine-month period between January 2021 and December 2021, and (4) make reasonable progress toward the return of the child within the same nine-month period.

See 750 ILCS 50/1(D)(b), (g), (m)(i)-(ii) (West 2020). The trial court arraigned respondent on the State's petition on the same day the petition was filed.

¶ 18                  1. *The Fitness Portion of the Termination Proceedings*

¶ 19        In February 2022, the trial court conducted a hearing on the fitness portion of the termination proceedings. At the hearing, respondent's counsel stated the following: "I spoke to my client, [respondent], about today's hearing and the purposes of it and what has to be proven. And based on her desires and wishes I would ask the Court for a short date so that she may sign specific consents." After expressing concerns about causing further delay, the court responded, "[I]f [respondent] is willing and you want to talk to her, that if she stipulates that the State has sufficient evidence to prove by clear and convincing evidence and makes that stipulation on the record, I would enter a finding of unfitness, but then postpone the best interest to allow her to sign consents. If she doesn't, we would proceed to best interest."

¶ 20        The trial court took a brief recess so respondent could speak with her attorney. After the recess, the court reiterated the suggestion that it had made, before the recess, to have respondent "stipulate that the State has sufficient facts to prove Counts 1, 2, 3, and 4 on this petition, and then I would continue the matter so you could prepare those consents and if you do sign consents *** that there be no formal termination of parental rights until of course the adoption of the child. So, I understand you discussed that with your attorney; is that correct?" Respondent answered in the affirmative, and the court asked if respondent was stipulating that the State could prove counts one through four by clear and convincing evidence. Respondent again answered in the affirmative. The trial court accepted respondent's stipulation—which the court noted was "made in consultation with her counsel that there is sufficient evidence"—and entered an unfitness finding.

- 6 -

¶ 21 The trial court then informed respondent that, during the recess, the court had been made aware of a bench warrant issued for respondent's arrest in a different case. The court explained that the State had filed a petition to revoke probation or conditional discharge in a DUI case against respondent. The court told respondent to go to the circuit clerk's office and file a motion to vacate the bench warrant. The court explained that if she did not file a motion to vacate the bench warrant, the court could not "let [respondent] participate anymore in the future unless you clear that up." Respondent stated she understood.

¶ 22 2. *The Best-Interest Portion of the Termination Proceedings*

¶ 23 In April 2022, the trial court conducted proceedings regarding whether it was in P.W.'s best interest to terminate respondent's parental rights. Respondent did not personally appear. Stephany Creviston testified that she was the caseworker assigned to the case since April 2021. P.W. was 10 years old and had been living in a "traditional spec[ialized] home" since October 2021. P.W. had struggles with depression, anxiety, anger, and sometimes aggression. P.W. engaged in counseling and met with a therapeutic mentor, both on a weekly basis.

¶ 24 Creviston testified that P.W. had been in six different placements. Some of the placements could not meet his needs or handle his behavior, and the foster parents at his last placement were physically and sexually abusing him. P.W. was doing well in his current foster placement. The current foster mother was a "specialized placement" because the mother had lots of prior experience dealing with teenagers who have histories of trauma. The foster mother had adopted several children from foster care previously and those children were now adults. Those children frequently visited and treated P.W. like a younger sibling. The foster mother was also fostering a 13-year-old boy. Creviston said P.W. and the boy had a "brotherly relationship" and got along very well.

- 7 -

¶ 25        Creviston testified that P.W. was doing well in the placement. All of his physical, emotional, and educational needs were being met, and the foster mother was ensuring P.W. received the counseling he needed. P.W. was developing a bond with the foster mother, and he had informed Creviston that if he could not return to his mother, he would like to live with his foster mother. When P.W. was first placed with the foster mother, she stated she was not an adoptive placement. However, the foster mother had now become very attached to P.W. and had expressed to Creviston a desire to adopt P.W.

¶ 26        Creviston opined that it was in P.W.'s best interest to terminate respondent's parental rights so that he could be adopted. Creviston explained that P.W. had a strong bond with respondent and he cried whenever Creviston brought up the possibility of P.W.'s not returning to respondent's care. Creviston stated, "He'll tell me that mom tells him that she's doing everything that she can. He'll tell me that he doesn't believe me. He gets very upset." Creviston opined that if P.W. had stability and finality in this termination case, instead of uncertainty, then his mental health would improve substantially. Creviston elaborated, "He has a lot of anxiety, and he really wants definite answers from a lot of people whether it be from me, foster mom, mom, and right now he's just not able to get those because we don't know where, we don't have the decisions yet. So, he gets a lot of anxiety from that."

¶ 27        The State asked Creviston a few questions about respondent's parental fitness. Creviston testified that respondent was discharged from substance abuse services in July 2021 and had not reengaged since. Creviston further testified that respondent failed to appear for a lot of drug tests and, in September 2021, respondent tested positive for alcohol, ecstasy, and methamphetamine.

¶ 28        The State rested.

¶ 29        The trial court found termination of respondent's parental rights was in P.W.'s best interest. The court stated the following:

"I do believe that the State has met their burden. First of all, the prospect of reunification with either [parent] is very slim if at all. Both were found unfit. Certainly, [respondent] by stipulation[,] in reviewing the case previously in accepting the stipulation[,] it was clear that the evidence would have been clear and convincing had that matter gone to hearing. With those findings of unfitness, the Court has to measure what is the prospect of reunification at least within a reasonable time, and that prospect was very, very slim."

¶ 30        The trial court then emphasized that P.W. was finally in a foster placement that was working well and P.W. was bonding and integrating well into that family. The court stated it understood that P.W.'s first preference was to live with respondent but the court believed P.W. "is starting to understand that that may not be an issue and perhaps my ruling will lend some definitiveness that might give him some comfort as to where he's going to be." The trial court concluded it was in P.W.'s best interest to terminate respondent's parental rights and be made available for adoption.

¶ 31        This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33        Respondent argues the trial court violated her due process rights because it failed to ask the State for a factual basis, or *sua sponte* provide its own, before it accepted her stipulation that the State could prove the various allegations of parental unfitness set forth in its motion to terminate parental rights. The State responds, in part, that the court's familiarity with the case was an adequate substitute for a factual basis such that respondent's due process rights

were not violated. We agree with the State.

¶ 34           A. The Trial Court's Failure To Specifically Acknowledge a Factual Basis for

Respondent's Stipulation Did Not Violate Her Due Process Rights

¶ 35                                    1. *The Law*

¶ 36           "When a trial court accepts an admission of unfitness, due process requires that

the trial court ensure the State's allegations are based in fact." *In re Dal. D.*, 2017 IL App (4th)

160893, ¶ 31. In the parental termination context, the factual basis requirement that supports an

admission that the child is abused or neglected is no more burdensome than in the criminal

context. *In re C.J.*, 2011 IL App (4th) 110476, ¶ 54, 960 N.E.2d 694. " 'All that is required to

appear on the record is a basis from which the judge could reasonably reach the conclusion that

the defendant actually committed the acts with the intent (if any) required to constitute the

offense to which the defendant is pleading guilty.' " *Id.* ¶ 51 (quoting *People v. Barker*, 83 Ill. 2d

319, 327-28, 415 N.E.2d 404, 408 (1980)). "In determining whether a factual basis exists, a court

need not rely on the State's factual basis provided at the unfitness hearing, but it could

*sua sponte* rely on evidence heard during earlier proceedings." *Dal. D.*, 2017 IL App (4th)

160893, ¶ 31. In fact, "a court may *sua sponte* look *anywhere in its prior proceedings* to

determine if a factual basis can be shown." (Emphasis added.) *Id.* ¶ 37.

¶ 37           The Illinois Supreme Court has held that the factors established in *Mathews v.*

*Eldridge*, 424 U.S. 319, 335 (1976), should be applied to determine whether procedures followed

in a proceeding to terminate parental rights satisfied the constitution's due process requirements.

*In re M.H.*, 196 Ill. 2d 356, 364, 751 N.E.2d 1134, 1140-41 (2001).

¶ 38                                    2. *This Case*

¶ 39           Here, the trial court had an abundance of evidence in the record to support its

accepting respondent's stipulation. The court was very familiar with the facts of the case and created an exceptionally thorough record at the permanency hearings through live testimony of the caseworker. Further, throughout the entirety of this case—from the shelter-care hearing through the termination proceedings—the trial judge remained the same. Accordingly, the court was intimately familiar with respondent's progress and lack thereof and the evidence the State would present to prove its allegations. Indeed, the court even heard the termination proceedings relating to P.W.'s siblings, and this court affirmed the termination of respondent's rights on appeal in that case. *In re K.P.*, 2022 IL App (2d) 210613-U, ¶ 10 ("[I]t is beyond dispute that respondent failed to make reasonable progress toward the minors' return. *** [R]espondent failed to maintain sobriety, she did not complete all required services, and she did not progress to consistent unsupervised visitation.").

¶ 40　　　　That constancy is consistent with what this court has recently suggested, that trial courts are required, to the extent possible, to stay with a case throughout the proceedings so that they can best effectuate the goals of the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2020)) and custody proceedings. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 33.

¶ 41　　　　We also note that the State presented some evidence of lack of progress at the best interest proceedings and the trial court stated the following: "in reviewing the case previously in accepting the stipulation it was clear that the evidence would have been clear and convincing had the matter gone to hearing." Had the trial court made this statement at the time it accepted the stipulation, that statement alone would have been sufficient to satisfy the factual basis requirement.

¶ 42　　　　For all these reasons, we conclude, under the facts of this case, it is indisputable that (1) the trial court had knowledge of an abundance of evidence to satisfy the factual basis

requirement and (2) respondent's due process rights were well protected, not violated. Accordingly, we affirm the trial court's judgment.

¶ 43 In closing, we note that the circumstances of this record on which respondent bases her appeal should never have occurred. The issue on appeal could have—and should have—been avoided if at the fitness portion of the termination proceedings, the trial court either (1) asked the State for a factual basis to support the allegations or (2) explained that it was *sua sponte* finding an adequate factual basis based on the information and testimony it had received during earlier proceedings. Using either option would have taken no more than a few seconds. And if a trial court does not ask for a factual basis for a respondent's stipulation at the fitness portion of a termination proceeding, the State should volunteer one anyway. The need to show a factual basis for the stipulation should not be overlooked. See *M.H.*, 196 Ill. 2d at 365-68.

¶ 44 An example of presenting a factual basis was set forth in *Dal. D.*, 2017 IL App (4th) 160893, ¶ 36, in which this court wrote the following:

"[T]he State could have merely asked the court to recall what it had heard at the permanency hearings the court had conducted about respondent's behavior. The court's doing so would have been sufficient because that recollection would have provided the court with more than sufficient information to ensure that the allegations against respondent were not simply made up."

¶ 45 III. CONCLUSION

¶ 46 For the reasons stated, we affirm the trial court's judgment.

¶ 47 Affirmed.