NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251081-U

NO. 4-25-1081

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.S., a Minor, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Woodford County |
| v. | ) | No. 24JA3 |
| Mahala S., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Michael L. Stroh, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding that respondent's admission of unfitness was supported by the record was not an abuse of discretion, and its finding that the termination of her parental rights was in her child's best interest was not against the manifest weight of the evidence.

¶ 2    The State filed a petition seeking to terminate respondent Mahala S.'s parental rights as to her son M.S., a minor (born in 2024). The trial court found respondent to be unfit and that termination of her parental rights was in M.S.'s best interest, so it granted the petition and terminated her rights. On appeal, respondent argues the fitness and best-interest determinations were in error. We affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. Initial Proceedings

¶ 5    In March 2024, the State filed a petition for adjudication of wardship, which

alleged, in part, that M.S. resided in an environment that was injurious to his welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2024)). The petition specified that the "minor's mother has previously been found unfit" on June 1, 2023, in another custody matter (Woodford County case No. 23-JA-5) pertaining to her daughter, A.S. (born in 2022), and that there was no subsequent finding of fitness. The State further asserted M.S. lives in a trailer lacking electricity or water. While the petition also named M.S.'s biological father, he ultimately forfeited his parental rights and is not involved in this appeal. During the shelter-care hearing, the public defender was appointed to represent respondent. The trial court found probable cause for the allegations in the petition and granted temporary custody of M.S. to the Illinois Department of Children and Family Services (DCFS).

¶ 6　　　　During a case management hearing in April 2024, the separate proceedings regarding M.S. and A.S. were placed on the same docket such that, though they were at different stages, the trial court would address both cases during the same proceedings. The court admonished respondent of her rights regarding M.S., and she admitted the allegations in the petition for adjudication of wardship. The court adjudicated M.S. neglected on April 1. During the dispositional hearing later that month, the court made him a ward of the court, relying on the ongoing finding of unfitness of respondent and the dangerous living environment, given the absence of electricity or water at home. M.S. was to remain in DCFS's custody, with a goal to return home in 12 months.

¶ 7　　　　The trial court held numerous subsequent permanency review hearings or case management conferences to track respondent's reasonable efforts to regain custody of M.S.

¶ 8　　　　　　　　　　B. Permanency Review Reports

¶ 9　　　　For reasons we will explain below, the record developed in the trial court even prior

to the fitness and best-interest hearings have some relevance here. Consequently, we summarize the content of the permanency review reports from Lutheran Social Services of Illinois (LSSI).

¶ 10 The LSSI reports reflect its recommendations for respondent, including visitation with M.S., a parenting course, domestic violence counseling, a substance abuse assessment, drug tests twice per month, and therapy. LSSI also recommended counseling "outside of LSSI due to [respondent]'s mental health needs exceeding the scope of the LSSI counselor" and that "neither parents should at this time parent child *** unless their mental health condition is deemed under control." Respondent allegedly had dual personalities, was afraid of the person inside her head, and had been hiding her mental health condition. In June 2024, the trial court ordered a psychiatric evaluation, noting that the reported dual personalities "speaks volumes about a need."

¶ 11 The report from December 2024 showed partial completion of service plan items. Jarret Witmer, the caseworker who supervised the visits with M.S. until an LSSI case aide took over supervision, wrote that respondent missed some visits with M.S. and when she did attend them, she allegedly "struggle[d] with engaging with her children for the entirety of her visits as [she] will often choose to entertain herself with her phone instead of focusing on building a bond by playing with her children." She completed her parenting course and all seven of her domestic violence classes. Her attendance for drug tests improved, and she tested negative each time she took a drug test. Overall, however, she missed approximately one quarter of the drug tests from June through December. While this report indicated her substance abuse assessment was outstanding, a subsequent report indicated it was completed in October.

¶ 12 Respondent had completed initial mental health counseling but had not yet obtained the psychiatric evaluation ordered by the trial court. The record does not delineate when exactly LSSI referred her to a psychiatric evaluator, showing only that the referral occurred by May 2025,

at which time she had already received a referral by her own primary care physician. Her counsel indicated that respondent had counseling scheduled for January 2025, but it is unclear whether this was the psychiatric evaluation and whether she followed through on that appointment.

¶ 13    Aside from the service plan items, the December 2024 report also indicated respondent's employment had not yet been verified. She continued to live in the trailer without running water or electricity. The report indicated that respondent had an altercation with M.S.'s biological father in May after the two had been drinking. Finally, the report indicated that respondent's alleged fiancé lived with her in the trailer and had a record of assault, larceny, fraud, and domestic battery.

¶ 14                                C. Fitness Hearing

¶ 15    In January 2025, the State filed the petition to terminate parental rights, such that its goal for M.S. became adoption. The petition alleged in paragraphs 7.a and 7.b, respectively, that from May 1, 2024, to January 1, 2025, respondent "has not made reasonable efforts to correct the conditions that caused the removal of the minor" and that she "has not made reasonable and substantial progress towards the return of the minor to the mother."

¶ 16    In June 2025, counsel for respondent offered an unsolicited admission to the allegations of unfitness in the petition but indicated she would not stipulate to the assertions regarding the child's best interest. The trial court proceeded to admonish her before accepting her admission. It recited the allegations pertaining to fitness and explained the rights respondent was giving up with the admission:

> "THE COURT: So you have a right to have a hearing [on] this petition. And this hearing is a bifurcated process[.] There is what we term a grounds hearing which establishes whether the State has met their burden in proving the allegations

- 4 -

contained within 7(a) and 7(b). If that is established, we then move on to the best interests portio[n] of the hearing wherein the court makes [a] determination after listening to evidence as to what to do, what is to be done in the best interests of the minor child, and does that include termination of the parental rights of the parents. Do you understand th[is]?"

¶ 17 Respondent indicated her understanding, as she had recently gone through the same two-step process when her parental rights as to A.S. were terminated in February 2025. The trial court asked for the factual basis supporting the stipulation. The State indicated the court ordered completion of services and that Witmer would testify that between May 1, 2024, and January 1, 2025, respondent "had not made reasonable efforts to correct the conditions that caused the removal of the minor during a nine-month period after adjudication as to different services that she had not made reasonable efforts to" and that

"[respondent] is unfit in the fact that she has no[t] made reasonable and substantial progress towards the return of the minor during the nine-month period of May 1st, 20[24] to January 1st, 2025, in that there were services that s[he] was to have completed to correct the conditions under wh[ich] the minor was taken into care, and he would testify as to the fact that multiple services had not been completed."

¶ 18 Respondent's counsel agreed the State had witnesses who could substantiate the factual basis. Respondent then admitted to the grounds portion of the petition. The trial court concluded there was a factual basis and accepted the stipulation.

¶ 19 At the conclusion of the hearing, the trial court set the matter for a best-interest hearing.

¶ 20 D. Best-Interest Hearing

¶ 21    In July 2025, the trial court held the best-interest hearing. At the outset of the hearing, the court noted that it had received the best-interest report, and all parties confirmed that they had reviewed it. No party offered any corrections to the report.

¶ 22    Jessica B., the foster mother, testified that M.S. lived with her and her husband since his second day of life. He resides with them in a safe neighborhood where he has his own bedroom. She described what they feed him, how they dress him, and who bathes him and takes him to medical appointments. M.S. calls his foster mother "Momm[a]" and calls his foster father "Dadda." They show him affection and describe him as a "sweet and loving boy." They have a nine-year-old daughter, who "adore[s]" M.S. Both sets of foster grandparents live within 30 minutes. They accept M.S. and think of him as their own grandchild. When he is not at home, he goes to family events and outings, church, and daycare in Peoria, Illinois, where he receives occupational and physical therapy. Jessica described this therapy as a doctor-recommended early intervention to address issues with walking, using his left hand, and developing his motor skills. Jessica testified that she and her husband wish to adopt M.S.

¶ 23    Respondent then testified that during visitation, she plays with M.S. using blocks. She explained what types of activities he likes to engage in and that he looks out of the window and calls things he sees "Dadda." During these visits, she calls his name and sometimes he calls her "Momma." She said she is never on her phone during her visits with M.S. She missed one visit because "the foster parent showed up the week before" and she "wasn't given any notice [of] that," but she did not provide an explanation for why she missed other visits. She testified that she previously had been enrolled in cosmetology school for a couple of weeks, and that she "just left" her job at McDonald's without school or another job lined up, such that during work hours, she would "often go to the park and play around." Regarding her current home life, respondent testified

that she lives with her adoptive father, along with a man who had a domestic violence record.

¶ 24 After hearing the arguments of counsel, the trial court announced its decision, stating that it had

> "considered the evidence presented, the best interests report filed by [LSSI]. The court has considered the argument of counsel and the best interests factors pursuant [to the] statute.
>
> It is apparent from listening to the evidence, observing the manner of the witnesses who testified, although the respondent mother at least speaks of a[n] interest in being the—remaining the mother of this child, it is apparent that it is in the best interests of this child that she not be this child's mother any longer. She has not proven over time an ability to adequately care for the needs of this child. She has not proven over time a sufficient interest in this child, given the amount of missed visitations that she has had. And she does not hav[e] the ability to care for, protect, and train this minor in comparison as to what this minor is receiving now.
>
> So [respondent], I have to find that the State has met its burden here. It is in the best interests of thi[s] minor that your parental rights be terminated and that the goal of this case be changed to adoption."

The court then terminated respondent's parental rights.

¶ 25 This appeal followed.

¶ 26                               II. ANALYSIS

¶ 27 On appeal, respondent argues that the trial court erred in finding that the State proved her unfit by clear and convincing evidence and that it was in the best interest of the child to terminate her parental rights.

¶ 28 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 29                                   A. Fitness Determination

¶ 30 A trial court's determination of unfitness is normally reviewed under the manifest weight standard. *In re N.G.*, 2018 IL 121939, ¶ 29. Here, however, the court's finding was made in the context of respondent's admission to unfitness. In this context, the court is required to determine whether a factual basis exists for the admission. *In re M.H.*, 196 Ill. 2d 356, 368 (2001). Where, as here, the court concludes that there is a factual basis for the parent's admission of unfitness, its determination is reviewed for an abuse of discretion. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 31. An abuse of discretion " 'occurs when the trial court's ruling is fanciful, unreasonable, or when no reasonable person would adopt [its] view.' " *In re L.S.*, 2014 IL App (4th) 131119, ¶ 44 (quoting *People v. Taylor*, 2011 IL 110067, ¶ 27). Analogizing to the factual basis of a guilty plea, this court has held " '[a]ll the trial court need do to comply with the factual basis requirement *** is to ask the prosecutor to *briefly* describe the evidence the State would be prepared to present if the case went to trial.' " (Emphasis in original.) *Dal. D.*, 2017 IL App (4th) 160893, ¶ 32 (quoting *People v. Williams*, 299 Ill. App. 3d 791, 794 (1998)).

¶ 31 Respondent contends that her admission was not knowingly and voluntarily made, in part, because the service plan was not filed at the appropriate time and was based on a "misapprehension of the case status." However, the requirement to file a service plan is directory,

not mandatory. *In re L.O.*, 2016 IL App (3d) 150083, ¶ 21 (citing *In re M.I.*, 2013 IL 113776, ¶ 17). Failure to file the service plan, even in the presence of a court ordering it, does not necessarily result in reversible error. *Id.* The record shows respondent was actually informed as to the services required of her. Respondent's brief acknowledges that the reports, which LSSI began filing before the nine-month statutory period even began, delineated the services. Further, neither respondent nor her counsel raised an issue or concern during the termination hearing about fair notice or confusion about what the services were. On this record, we find any failure to file the service plan to be harmless.

¶ 32        Respondent cites *In re T.D.* as an example of an agency failing to keep a parent apprised of the service plan, such that "the tasks within those plans cannot alone support the finding of unfitness." *In re T.D.*, 268 Ill. App. 3d 239, 247 (1994). However, *T.D.* turns on notice, not filing. See *id.* at 245-47. The parent in *T.D.* was incarcerated, underwent a prison transfer, and "[t]here [was] no indication in the record that any of the DCFS workers involved in this case ever contacted the Department of Corrections in an effort to locate respondent." *Id.* at 246. Because the respondent in *T.D.* received no notice of the service plan in any form, it is materially different from the facts here. *Id.*

¶ 33        Additionally, respondent argues that the stipulation was based on inaccuracies and that she complied with nearly every requirement in the service plan. As discussed above, when a trial court accepts an admission of unfitness, due process requires that the trial court ensure the State's allegations are based in fact. *In re C.J.*, 2011 IL App (4th) 110476, ¶¶ 29-30.

¶ 34        Normally, a reviewing court focuses only on the facts admitted during the fitness hearing. See *In re Dar. H.*, 2023 IL App (4th) 230509, ¶¶ 46-49 ("We reiterate that a trial court's fitness findings made after it conducted a hearing on a petition to terminate parental rights are to

be based solely on the evidence the court heard at the fitness hearing, *not* on any evidence that may have been presented at other hearings that preceded the fitness hearing." (Emphasis in original.)). Here, however, because the finding of fitness is based on a stipulation, we may *sua sponte* consider evidence that appears elsewhere in the record that establishes the factual basis. *Dal. D.*, 2017 IL App (4th) 160893, ¶¶ 30-37.

¶ 35       The factual basis suggested by the State was that evidence would show a failure to make reasonable and substantial progress towards returning M.S. We have deemed this to be sufficient in other cases. *Id.* ¶¶ 17, 43. Looking at the record as a whole, there is some evidence that respondent complied with certain aspects of the service plan. For example, during the relevant nine-month period, respondent attended some visits with M.S., finished the initial mental health counseling, completed her substance abuse assessment, and attended all seven classes for domestic violence. She also consistently tested negative in various drug tests. However, the record also shows that respondent allegedly failed to show up or engage with M.S. for scheduled visitation and failed to appear for nearly a quarter of her drug tests overall. These pertained to requirements under the service plan, and the trial court could fairly have relied upon these failings as a sufficient factual basis to support respondent's admission to unfitness. See *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (citing *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)) (emphasizing that reasonable progress can be shown when the parent has *fully* complied with the court's directives and the court can conclude the minor can be returned to the parent in the *near* future). The fact that Witmer, the caseworker who signed the reports, ultimately transitioned supervision of visitation with M.S. to a case aide does not undermine the factual basis. Nothing suggests Witmer could not have testified regarding the visits he attended, and respondent has repeatedly failed to deny or explain the substantive issue of her absence from a number of visits.

¶ 36        Furthermore, the record shows respondent willingly moved back into the same space that had no running water or electricity. Though these considerations may not have been in the service plan, they are relevant to the fitness determination. *In re C.N.*, 196 Ill. 2d 181, 215-16 (2001); *In re M.D.*, 2022 IL App (4th) 210288, ¶ 66 (allowing consideration of the reason the child was removed from the respondent's custody in the first instance); see *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1051-52 (2003) (finding unfitness when mere completion of the service plan items failed actually to help the respondent become a better parent); see also *In re Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 56-57 (affirming finding of unfitness, despite the parent completing every task in the service plan and communicating with caseworker, where conditions causing removal were not corrected and the children could not be returned home safely); *T.D.,* 268 Ill. App. 3d at 247-49 (affirming finding of unfitness for failure to show interest in the child regardless of compliance with the service plan). Respondent argues this consideration was not part of the factual basis such that the State cannot now use it to justify the finding of unfitness. But the factual basis proffered by the State represented that respondent "had not made reasonable efforts to correct the conditions that caused the removal of" M.S., which implicates the problematic home environment that was one of the reasons for M.S.'s removal.

¶ 37        Accordingly, even if the service plan was not filed, and respondent completed a number of services, the trial court did not abuse its discretion in finding an adequate factual basis to support respondent's admission of unfitness. Respondent knew of the service plan, did not fully comply with it, and failed to correct the conditions that initially led to M.S.'s removal from her custody.

¶ 38                    B. Best-Interest Determination

¶ 39        Respondent also contends that the trial court's finding that termination of her

parental rights was in M.S.'s best interest was against the manifest weight of the evidence. Her argument principally relies on her assertion that the court relied on inaccurate reports and improperly shifted the burden of proof.

¶ 40    The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). The applicable factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)) are

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 41 Respondent argues the trial court improperly considered the reports because no caseworker or supervisor testified regarding their accuracy, they were never admitted into evidence, and there was no basis for the court to take judicial notice of them. Respondent relies on *In re J.P.*, where a best-interest finding was reversed, in part because the court relied on hearsay evidence in the reports about the respondent's addiction to cocaine, which was not presented at the best-interest hearing at all. *J.P.*, 316 Ill. App. 3d 652, 662-63 (2000). We note that the rules of evidence do *not* strictly apply during the best-interest hearing. See, *e.g.*, *In re Al. P.*, 2017 IL App (4th) 170435, ¶ 41. Courts may take judicial notice of facts from the reports at the best-interest stage, though they should not take notice of the entire record. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1069-71 (2009). Here, the court indicated that it "considered" the reports, but it did not otherwise mention specific facts from them that it relied upon in reaching its finding about the child's best interest. Similarly, the court never indicated that the reports actually impacted its decision. Rather, the specific reasons the court cited to support its finding—such as missing visitation with M.S.— came from or were supported by facts entered into the record by way of testimony. We find *J.P.*

inapposite and any error here harmless. *C.f. In re A.B.*, 308 Ill. App. 3d 227, 239 (1999) (Though the court improperly considered the entire neglect file to make its fitness determination, the error was harmless when the "other evidence was sufficient.").

¶ 42    Indeed, testimony at the hearing supports the trial court's best-interest finding. M.S.'s foster mother testified that M.S.'s needs were met in foster care, where he had his own room in a safe neighborhood and had community with his foster family, daycare, and church. He has been able to receive support, affection, and physical therapy. He has lived with his foster parents for all but the first couple of days of his life, and they have indicated a desire to adopt him. Contrarily, M.S. only lived with respondent for approximately one day at the beginning of his life. Respondent's abilities as a parent are unknown, and her own testimony gave no excuse for various failures to attend the scheduled visits with M.S., her decision to leave employment at McDonald's without another job or school lined up, and her choice to move back into a trailer with no electricity or water with someone who has a reported history of domestic violence.

¶ 43    Additionally, respondent's argument about errors in the record falls short. Specifically, she claims the best-interest report incorrectly indicated she did not complete her substance abuse assessment. But the trial court did not expressly rely on respondent's alleged lack of completion of the substance abuse assessment to make the best-interest determination, and appropriately so, as the focus is on the child. Further, there were numerous other considerations in play, such that any error was harmless. See *In re Adoption of C.D.*, 313 Ill. App. 3d 301, 315 (2000) (applying harmless error in the context of a best-interest determination). Further, respondent notes that while the reports indicate she was on her phone during visits with M.S., she testified to the contrary. There is no indication the court favored the report over her testimony on this point, and succeeding on this point is not enough to show the trial court's best-interest

determination was against the manifest weight of the evidence. See *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) ("A reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence.") (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 506 (1985)); *In re Custody of H.J.*, 2021 IL App (4th) 200401, ¶¶ 23-24 (stating, in a case with evidence pointing in both directions, the appellate court would affirm because of the highly deferential manifest weight standard of review).

¶ 44 Finally, respondent argues the trial court improperly shifted the burden of proof when it remarked on whether she demonstrated she was a good parent and because the court allegedly relied on her compliance with the services rather than the interests of the child. Respondent is correct that "following a finding of unfitness, *** the focus shifts to the child." See *D.T.*, 212 Ill. 2d at 364. However, the court's references to her inability to care adequately for M.S.'s needs, take sufficient interest in him, or attend visitation are consistent with focusing on the best interest of the child. Furthermore, the court specifically concluded its analysis by stating: "I have to find that the State has met its burden here. It is in the best interests of thi[s] minor that your parental rights be terminated and that the goal of this case be changed to adoption." This articulation shows that the court knew the burden was on the State and the focus was on the child.

¶ 45 Accordingly, the trial court's best-interest determination was not against the manifest weight of the evidence.

¶ 46                                 III. CONCLUSION

¶ 47 For the reasons stated, we affirm the trial court's judgment.

¶ 48 Affirmed.