NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251291-U

NO. 4-25-1291

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* C.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 25JA48 |
| v. | ) | |
| Andrea Z., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment, concluding no issue of arguable merit could be raised on appeal.

¶ 2    In April 2025, the State filed a petition pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2024)), alleging C.B. (born October 2010), the child of respondent, Andrea Z., and Joshua B., was a neglected minor. (When the State filed its petition, C.B. was in the custody of his grandmother, Melinda R., who served as his short-term guardian. Melinda R.'s guardianship was vacated by the trial court, and she is not a party to this appeal.) Following a joint adjudicatory and dispositional hearing, the court entered orders adjudicating C.B. neglected and finding respondent fit but unable to care for C.B. Respondent timely filed a notice of appeal, and counsel was appointed to represent her. (Joshua B., who was found unfit and unwilling, is not a party to this appeal.) Respondent's counsel now moves

to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), contending "an appeal in this case would be meritless." See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (holding *Anders* "applies to findings of parental unfitness and termination of parental rights"). We agree and grant counsel's motion to withdraw and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                          A. The State's Shelter Care Petition

¶ 5           On April 8, 2025, the State filed a petition alleging C.B. was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2024)). We note portions of the petition were later stricken by the State without objection. Because of this, we have omitted references to those portions of the petition below. The remaining portions of the petition alleged:

"a. On or about March 20, 2025, [the Illinois Department of Children and Family Services (DCFS)] received an online referral for service assessment for the family due to reported concerns including that [C.B.] had missed multiple medical appointments, that [C.B.] was discharged from his [primary care provider (PCP)], and that [C.B.] may not be receiving medications.

b. On or about March 21, 2025, DCFS received a hotline report which alleged that the short-term guardian, Melinda [R.], failed to provide adequate medical care to [C.B.]

c. On or about March 21, 2025, DCFS Investigator [Jaclyn] Thompson went to [C.B.'s school] in an attempt to see [C.B.] Investigator Thompson was advised that [C.B.] was absent that day and was advised that [C.B.] is often absent from school. Investigator Thompson met with school nurse, Christy Dillard. Christy

advised that [C.B.] is non-verbal, has a feeding tube, a foley catheter, and is wheelchair reliant. Christy advised that on February 26, [C.B.] was sent to school with a note from Melinda stating that she provided yogurt for [C.B.]'s lunch. The school told Melinda that they could not give him yogurt as [C.B.] is NOP (no oral feeds). Melinda became upset, raised her voice, and stated, 'if I have to come to school myself and give it to him I will. I'm his grandma and he is a grown teenager. I give him syringes of yogurt everyday and he does just fine.' It was noted that there has been a year's long need for a swallow study but it had not been done. Christy advised that in February, Melinda stated that [respondent] was going to come and take [C.B.] back with her to Wisconsin. Christy advised that on February 27, Melinda stated that [respondent] did not come and get [C.B.] and stated she would be happy when [respondent] took [C.B.] back because she is ready to 'be old' with her husband. Christy reported that [C.B.] is allergic to nuts and has a doctor's order for an EpiPen but Melinda has not provided the school with an EpiPen. *** Christy provided a printout of [C.B.]'s school attendance: August 2024 missed 4 out of 12 days, September 2024 missed 5 out of 20 days, October 2024 missed 22 out of 22 days, November 2024 missed 14 out of 17 days, December 2024 missed 11 out of 15 days, January 2025 missed 17 out of 18 days, February 2025 missed 13 out of 18 days.

d. On or about March 21, 2025, DCFS Investigator Thompson went to Melinda's residence. Melinda was not home and Melinda's husband was outside working on a car. [C.B.] was *** in the house in a recliner in the living room which also serves as [C.B.]'s bed and bedroom. Melinda arrived home a few minutes after

Investigator Thompson's arrival. Melinda stated [C.B.] has been living with her since August 2024. Melinda stated [respondent] lives in Wisconsin. Melinda stated Joshua is not involved in [C.B.]'s life and may life [*sic*] in South Carolina. Melinda stated [C.B.] has his days and night mixed up so he has been sleeping during the day and has been too tired to go to school. Melinda stated [C.B.] is in kidney failure. Melinda stated there [have] been previous discussions about having a swallow study done but stated a study has not been completed. Melinda admitted to feeding [C.B.] yogurt and other liquid type foods orally because, 'if he takes it, why not give it to him.' Melinda stated the only medications that [C.B.] receives are a laxative and occasional [Benadryl] or melatonin. Melinda stated there was an issue this past week with getting home health to come out to change [C.B.]'s foley catheter. Melinda admitted there was a missed visit, stating her husband had a medical appointment the same day and she had to choose who would be seen. Melinda stated she cancelled [C.B.]'s appointment and stated the doctor would not send out home health again until [C.B.] was seen. Melinda agreed to take [C.B.] to the [emergency room (ER)] and Melinda's husband carried [C.B.] to the car by cradling [C.B.] in his arms. Melinda followed behind carrying [C.B.]'s foley bag and would allow the foley bag to drop and drag on the ground.

e. On or about March 21, 2025, [C.B.] was taken to Carle Pekin Emergency Department. Medical staff advised that they were not allowing [C.B.] to leave medical care and would implement their own protective custody if necessary to transfer [C.B.] to OSF St. Francis as Carle Pekin was not equipped to meet [C.B.]'s needs. While waiting for lab work to be complete, Melinda stated to Investigator

- 4 -

Thompson that this would be a type of 'mini vacation' for [C.B.] Melinda also stated to Investigator Thompson that she would sooner take [C.B.] to [respondent] in Wisconsin before 'letting the State take him.' Melinda left the hospital at 4:00 p.m. and said she would return shortly but had not returned as of 7:00 p.m. Further, Melinda refused to provide contact information for [respondent].

f. On or about March 21, 2025, Carle Health Pekin ED Provider Notes were authored by [advanced practice registered nurse] Ashley Marmon. The following was noted:

i. 'Patient brought in by grandma because DCFS "made her come here" grandma states patient needs home health care and needs his catheter changed but states this is not why she brough[t] patient here.'

ii. 'Grandma states he has not had any medications since he was discharged from St. Francis Medical Center at his last hospitalization ***.'

iii. 'When asked why she is giving him foods by mouth she states that her goal is to get him off of the feeding tube completely b[y] the time he goes back to [respondent]. When I stated to grandma that I believe the feeding tube is going to be a permanent fixture in his life and that he is not supposed to be having oral fluids or foods secondary to history of aspiration she informed me that she believes this is all just laziness.'

iv. 'Primary care office has expressed concern that patient is losing a significant amount of weight.'

v. 'There has been expressed concern from both school and primary care office that patient has not been attending specialty appointments...

Patient was referred to endocrinology and [it] has been reported that there [have] been attempts to reach out to grandma to schedule follow up with the endocrinology without any contact being made.'

vi. 'Of note patient was discharged from PCP office secondary to multiple no call no show visits.'

vii. 'It is apparent that patient is not receiving the appropriate care whether this is secondary to medical neglect or [miseducation]/educational deficit.'

viii. 'Encounter Diagnosis: Acute cystitis with hematuria, hypoglycemia, failure to thrive, medical neglect of adult by caregiver.'

g. On or about March 24, 2025, DCFS Investigator Thompson spoke with [C.B.]'s care team at OSF St. Francis. [C.B.] was being treated for a urinary tract infection and was being monitored for suspicious weight loss. Medical staff was attempting to determine what medications [C.B.] has been prescribed, which ones [C.B.] is still actively prescribed, which ones were stopped due to non-compliance, and which ones were stopped by medical professionals. Medical staff noted there appeared to be many missed appointments which led to a lapse in [C.B.]'s care. Medical staff noted that they had determined that [C.B.] was prescribed a continuous antibiotic in order to prevent urinary tract infections and an injectable medication to help mitigate the symptoms of his kidney disease. It was noted there were numerous contact attempts after the injection was prescribed but it was never filled. Medical staff noted that there are a number of possible negative effects that could be caused by these prescriptions not being followed as ordered such as pain,

infections, sepsis, and a drop in hemoglobin levels. It was noted that symptoms could be mild or could lead to death. It was also noted that [C.B.] has been prescribed to receive all nutrition through a feeding tube as he is severely prone to aspiration when taking anything orally.

h. On or about March 27, 2025, [C.B.] underwent a surgical vesicostomy. After surgery, [C.B.] was found to have an abdominal hematoma and had surgery on March 28, 2025 for a hematoma evacuation. Following surgery, [C.B.] continued to have medical complications including lung issues that resulted in [C.B.] needing to be intubated.

i. On or about March 31, 2025, Melinda stated to DCFS Investigator Thompson that Investigator Thompson had no right to do this and that Investigator Thompson does not know [C.B.] or the family. Melinda further stated 'if something happens to him up there I sure hope you can live with yourself' and 'you're a piece of work.'

j. On or about April 1, 2025, DCFS Investigator spoke with [respondent]. [Respondent] stated she left [C.B.] in Melinda's care while she got her affairs in order in Wisconsin. [Respondent] stated that as far as she knew, [C.B.] was attending school regularly. [Respondent] stated she is a good mom and that her other children have suffered because of [C.B.] being sick all the time. [Respondent] expressed frustration as the difficulty in having to drop everything to care for [C.B.] [Respondent] stated she knows [C.B.] won't be around long and stated she isn't going to have him get a kidney transplant just so he can die not long after. [Respondent] stated [C.B.] is dying and his kidneys are failing and that it is not

anyone's fault, he was born that way. [Respondent] stated that she was last in town over Christmas and Melinda stated [C.B.] was going to all of his appointments. Respondent stated [C.B.] is to be on a preventative antibiotic and a kidney medication. [Respondent] stated [C.B.] has always been tube fed. [Respondent] stated she was aware that Melinda was giving [C.B.] yogurt by mouth but stated Melinda claimed she was told it was ok. [Respondent] denied that there was ever a plan to have [C.B.] off of a feeding tube. [Respondent] stated she thinks Melinda got overwhelmed. ***

k. On or about April 1, 2025, [registered nurse (RN)] Brisbin advised DCFS Investigator Thompson that Melinda called the hospital on March 31 and cursed him out. RN Brisbin stated he felt that Melinda was unwell in some fashion because she would go back and forth from being hostile and cursing to being calm.

l. On or about April 4, 2025, DCFS Investigator Thompson spoke to Melinda who stated she would not be signing another safety plan. Melinda stated that Investigator Thompson was not Judge and jury and stated that no doctor has said that she neglected [C.B.] and that investigator Thompson cannot just [pass] judgment. Melinda then hung up on Investigator Thompson. Protective custody of [C.B.] was taken at this time.

m. On or about April 4, 2025, DCFS Investigator Thompson spoke with [respondent]. [Respondent] stated that Melinda went out to get drunk on March 31 instead of going to see [C.B.] in the hospital. [Respondent] stated that this did not surprise her as this is what Melinda has always done.

n. Melinda has been indicated by DCFS on September 7, 2017[,] for

79-Medical Neglect.

> o. [Respondent] has been indicated by DCFS on July 2, 2014[,] for 60-Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect, on September 7, 2017[,] for 79-Medical Neglect.

> p. [Respondent] was previously involved in intact services from July 11, 2014[,] to December 24, 2014 (case closed due to failure to engage in services)[,] and from February 16, 2017[,] to May 3, 2017 (case closed due to family moving from state without notice).

> q. As of April 7, 2025, [C.B.] remains hospitalized."

¶ 6 That same day, the trial court entered a temporary custody order finding (1) there was probable cause for the State's petition, (2) there was an immediate and urgent necessity to remove C.B. from his guardian, and (3) reasonable efforts were made to keep C.B. in his guardian's custody, but those efforts did not eliminate the need for C.B.'s removal. The court granted temporary custody and guardianship of C.B. to DCFS. We note there was no report of proceedings from the shelter care hearing provided as part of the record on appeal. However, according to the court's written order, respondent received notice and was present at the hearing.

¶ 7 On June 11, 2025, respondent filed a written answer to the State's petition, which was signed by respondent and her attorney. The answer stated, "Respondent neither admits nor denies the allegations *** but stipulates the allegations could be proven to the applicable standard of proof," and, "Respondent lacks personal knowledge as to the allegations in [counts A-I] and does not demand strict proof of said allegations." After respondent's written answer was filed, the case was continued multiple times for various reasons and ultimately scheduled for a joint adjudicatory and dispositional hearing on November 5, 2025.

¶ 8                    B. Joint Adjudicatory and Dispositional Hearing

¶ 9            At the outset of the joint adjudicatory and dispositional hearing, the trial court noted it had received respondent's written answer to the State's petition. The court admonished respondent as to her rights with respect to the State's petition and inquired whether respondent still wished to stipulate to the allegations in the petition. After a discussion with her attorney, respondent affirmed her desire to stipulate to the petition and agreed she was doing so "freely and voluntarily." Moreover, respondent asserted she understood the consequences of her stipulation, was thinking clearly, had adequate time to consult with her attorney about her decision, and was not "under the influence of any drugs, alcohol, [or] prescription medication." The State then proffered the following factual basis for the allegations.

> "In order to prove Count A and B, we would be calling members of DCFS. They would testify as to the allegations of the hotline reports.
>
> Count C would be proven by the testimony of Investigator Thompson. March 21st she went to [C.B.'s] school to speak [to] the minor's school personnel. She was advised he had been absent from school a numerous amount of time. He is supposed to be fed through a feeding tube exclusively; however, the grandmother was giving him syringes of yogurt. ***
>
> Count D would be proven by Investigator Thompson. She would testify that on March 21, 2025, she went to the guardian's home. *** The guardian had stated that the minor had been living with her since August of 2024. Guardian reported minor was in kidney failure. When asked about tube feeding, the guardian states that he takes it, why not give it to him. The child was immediately taken to the ER.
>
> In order to prove Count E we would be entering into evidence certified

records from Carle-Pekin. Minor was taken there. They did not believe that they were equipped to take care of the minor's needs so the minor would need to be taken to OSF. Investigator Thompson would state that the guardian stated that it would be 'a mini vacation for the minor.' She also left the hospital and was gone for hours without contact and she refused to provide the contact information for [respondent].

Count F would be proven by Carle Health-Pekin [emergency department] notes which would include the fact that the minor was not going to appropriate doctors' appointments. The guardian had stated the reason why the child was only being tube fed was because it was just laziness. The primary care office had concerns for significant weight loss. They stated it was apparent the patient was not receiving appropriate care whether that was secondary to medical neglect or educational deficit.

In order to prove Count G, Investigator Thompson would state that she spoke to OSF about the child having urinary tract infections, suspicious weight loss, numerous missed medical appointments. The doctors were trying to figure out what prescriptions he was being given. Even though he had been prescribed certain ones, they weren't being filled. He was supposed to be receiving all of his feeds through a tube.

Count H would be proven by the OSF records showing that on March 27th the minor underwent a surgery. Then the next day he underwent an abdominal hematoma surgery. He then had to be intubated for his lung issues.

Count I would be proven by Investigator Thompson. She would state the

guardian told her she had no right to do this. She doesn't know the minor, the family, and then the guardian stated, [']If something happens to him there, I sure hope you can live with yourself['] and [']you're a piece of work.[']

Count J would be proven by the testimony of Investigator Thompson. She would testify that she spoke with [respondent]. [Respondent] stated she lived in Wisconsin. She left her child there while she got her affairs in order in Wisconsin. She stated that her other children have suffered because of the minor being sick. She stated the minor won't be around long. She stated she wasn't going to have him get kidney transplant just to die. She stated she thought he was going to all of his appointments. She stated he is supposed to be tube fed. ***

*** 

Count K, we would be calling RN Brisbin from OSF. He would testify that Melinda called the hospital and cursed him out.

Count L would be proven by the testimony of Investigator Thompson who stated that they put a safety plan in place. Again, Melinda hung up on the Investigator and became angry.

Count M would be proven by Investigator Thompson. In speaking with [respondent], she stated that Melinda had went out and got drunk on March 31st instead of going to see the minor at the hospital.

Count N would be proven by certified copy of the listed indication for medical neglect from 2017 on the guardian.

Count O would be proven by certified copies of the listed indicated records including medical neglect on [respondent] in 2017.

Count P would be proven by DCFS records showing that [respondent] had previously been involved in intact services but the case closed due to the family moving from the state without notice.

Count Q would be, again, proven by the medical records."

Based on respondent's stipulation and the proffered factual basis, the court found the State proved by a preponderance of the evidence C.B. was a neglected minor "by way of injurious environment." The court then proceeded immediately to a dispositional hearing.

¶ 10 Prior to hearing evidence or argument, the trial court noted it had received a copy of the dispositional report and two addenda filed prior to the hearing. Those reports indicated C.B. was currently placed in a nursing facility, which provided him with 24-hour care. He was also attending a new middle school, which was located across the street from the nursing facility. Respondent was cooperative with DCFS, had attended all but one of her supervised visits with C.B., and planned to move from Wisconsin to Illinois. However, because respondent currently lived in Wisconsin, DCFS was unable to refer her to any services. The reports recommended respondent continue to cooperate with DCFS and that the trial court find respondent fit and allow respondent to have unsupervised visits with C.B. The court then inquired whether the caseworker had any edits or updates to the reports. In response, the caseworker stated respondent had "fully moved" from Wisconsin to Illinois. After the caseworker provided this update, the State called her as witness.

¶ 11 1. *Testimony of Mira-Cler Joy Josaiah*

¶ 12 Mira-Cler Joy Josaiah, a child welfare specialist with DCFS, had been the caseworker assigned to C.B.'s case since he came into care. After C.B. came into care, respondent moved from Wisconsin to Illinois so "she could be closer to [C.B.] in hopes of having him return

home." Respondent's new residence was more appropriate for C.B.'s medical needs—the residence was a single-level home, it was close to C.B.'s care team, and respondent had a medical bed set up for C.B. Josaiah testified there was a plan in place between DCFS, C.B.'s care team, and respondent to transition C.B. into respondent's care. According to Josaiah, respondent met "minimal parenting standards," and Josaiah recommended respondent's visitation be increased to unsupervised visitation. In addition to recommending an increase in respondent's visitation, Josaiah also recommended respondent be allowed access to C.B.'s medical information so she could stay informed about his medical care.

¶ 13                                    2. *Trial Court's Ruling*

¶ 14            Following the parties' arguments, the trial court found respondent fit but unable to care for C.B. In its oral ruling, the court highlighted C.B.'s complex medical needs and stated it believed C.B.'s needs were "beyond what can be provided in a home setting." The court empathized with respondent's position but stated it was in C.B.'s best interest to remain in his current placement. It noted,

> "[W]e need to get grasp on *** his medical needs. I think he's in a good spot and I think he's medically stabilized. *** He's now going to school routinely. Therapeutic services are being provided. The school is right across from the nursing home facility in which he is cared for."

The court ordered respondent to participate in the following services: a substance abuse assessment and any recommended treatment, a parenting class, counseling, and random drug testing. It further ordered respondent be allowed access to C.B.'s medical information so she could remain informed about his medical care and DCFS had discretion to allow unsupervised visits between respondent and C.B.

¶ 15　　　　This appeal followed.

¶ 16　　　　　　　　　　　　　II. ANALYSIS

¶ 17　　　　On appeal, respondent's counsel moves to withdraw, contending he cannot raise any meritorious or nonfrivolous arguments on appeal. In support of his motion to withdraw, counsel submitted a memorandum of law, which included a statement of facts and argument as to why respondent's potential claims lack merit. In the memorandum of law, counsel evaluated the following claims: (1) whether respondent's stipulation to the State's petition for adjudication of wardship was supported by a sufficient factual basis, (2) whether respondent's stipulation was knowing and voluntary, (3) whether the trial court erred in finding the State had proven its petition for adjudication of wardship by a preponderance of the evidence, and (4) whether the court erred in finding respondent fit but unable to care for C.B. Counsel provided proof of service of his motion and memorandum on respondent, and respondent was provided notice of the opportunity to file a response. Respondent failed to do so. After examining the record and counsel's motion to withdraw, we agree with counsel's conclusion there are no issues of arguable merit to be raised on appeal.

¶ 18　　　　　　　　　　A. Adjudication of Wardship

¶ 19　　　　"A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The Juvenile Court Act sets forth the procedure the trial court must follow in determining "whether a minor should be removed from his or her parents' custody and made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 18.

¶ 20　　　　After the State files a petition for adjudication of wardship, the trial court must hold

an adjudicatory hearing, where the State presents evidence in support of its petition. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1068 (2009). The burden is on the State to prove the allegations in its petition by a preponderance of the evidence. *In re S.R.*, 349 Ill. App. 3d 1017, 1020 (2004). If the trial court determines the State has proven by a preponderance of the evidence the minor is abused or neglected, the case proceeds to a dispositional hearing. *Jay. H.*, 395 Ill. App. 3d at 1068.

¶ 21        At the dispositional hearing, the trial court must answer two questions. First, "[is it] in the best interests of the minor and the public that the minor be made a ward of the court"? 705 ILCS 405/2-22(1) (West 2024). Second, if the minor is made a ward of the court, what is the proper disposition for the minor, considering "the health, safety and interests of the minor and the public"? *Id.* When answering the second question, the court must determine whether "the parents are unfit or unable *** 'to care for, protect, train[,] or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of *** her parents.' " *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008) (quoting 705 ILCS 405/2-27(1) (West 2006)). If the court determines the parents are unfit, unwilling, or unable and the best interest of the minor would be jeopardized if the minor remains in the parents' custody, it may grant custody and guardianship of the minor to DCFS. *Id.*

¶ 22                    B. Trial Court's Finding C.B. Was Neglected

¶ 23        "On review, a trial court's finding of [abuse or] neglect will not be reversed unless it is against the manifest weight of the evidence." *A.P.*, 2012 IL 113875, ¶ 17. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 24                            1. *Respondent's Stipulation*

¶ 25        Respondent stipulated to the allegations contained in the State's petition for adjudication of wardship. Illinois courts have long held, "for a parent's admission to be valid in an

adjudicatory phase of a neglect proceeding it must be intelligently and voluntarily made. [Citation.] This knowing and voluntary requirement protects a parent from admitting to neglect or abuse when their conduct does not fall within the State's allegations." *In re M.H.*, 196 Ill. 2d 356, 366 (2001). Prior to accepting respondent's stipulation to the allegations in the petition, the trial court conducted an extensive colloquy with respondent. The court ensured respondent understood her rights with respect to the State's petition and verified she wished to forgo an evidentiary hearing and stipulate to the allegations. After verifying respondent wished to stipulate to the allegations, the court inquired whether respondent was doing so "freely and voluntarily" and confirmed she was not under the influence of any drugs, alcohol, or prescription medication. Based on all of this, it is clear respondent's stipulation was knowing and voluntary, and we agree with counsel that any argument to the contrary would be frivolous.

¶ 26                                    2. *Factual Basis*

¶ 27         In addition to ensuring a stipulation is knowing and voluntary, our supreme court has held that "due process requires a [trial] court to determine whether a factual basis exists for an admission of parental unfitness before it accepts the admission." *Id.* at 368. Although *M.H.* involved a parent's stipulation to unfitness at a termination of parental rights hearing, this court has applied the same factual basis requirement to a parent's stipulation of neglect at an adjudicatory hearing. See *In re C.J.*, 2011 IL App (4th) 110476, ¶ 32.

¶ 28         Here, the State provided an extensive factual basis to support the allegations in its petition. The State went through each individual count of its 17-count petition and proffered the evidence it would use to prove each count. Based on the State's detailed proffer, the trial court had ample evidence to find there was a sufficient factual basis to support respondent's stipulation to the allegations in the petition. As such, we agree with counsel that any argument there was not a

sufficient factual basis to support respondent's stipulation to the allegations in the State's petition would be without merit.

¶ 29        Because we have found respondent's admission was knowing and voluntary and supported by a sufficient factual basis, it is evident the trial court's finding that C.B. was a neglected minor was not against the manifest weight of the evidence.

¶ 30        C. Trial Court's Finding Respondent Was Fit but Unable

¶ 31        A trial court's decision at a dispositional hearing "will be reversed *** if the findings of fact are against the manifest weight of the evidence." *J.W.*, 386 Ill. App. 3d at 856. "In contrast to the adjudicatory hearing, where the court determines only whether the child is abused or neglected, the wardship determination at the dispositional hearing 'is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life.' " (Emphasis omitted.) *In re M.D.*, 2022 IL App (4th) 210288, ¶ 64 (quoting *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15). Because of this, "[t]he court may consider evidence of parental deficiencies in the child's environment beyond those alleged in the petition." *Id.* ¶ 65.

¶ 32        In this case, the evidence demonstrated C.B. had been placed in a nursing facility, which provided him with 24-hour care. At the nursing facility, he received medical care and therapeutic services. He also began attending school regularly at a school located across the street from his placement. Based on the medically complex needs of C.B., the trial court determined it was in his best interest to remain in his current placement. The court indicated it was finding respondent unable solely because C.B.'s complex medical needs appeared too great for home care. We find, based on our review of the record, the court's decision was not against the manifest weight of the evidence.

¶ 33        III. CONCLUSION

¶ 34    For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 35    Affirmed.